**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| ARTHUR DEKENIPP, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| HCA HEALTHCARE, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Arthur Dekenipp ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant HCA Healthcare, Inc. ("Defendant" or "HCA") as an individual and on behalf of all others similarly situated, seeking monetary damages, restitution, and/or injunctive relief for the proposed Class, as defined below. Plaintiff makes the following allegations upon information and belief, the investigation of his counsel, and personal knowledge or facts that are a matter of public record.

## SUMMARY OF THE CASE

1.      HCA is a Nashville-based healthcare company with 182 hospitals and approximately 2,300 ambulatory care centers in 20 states. These care centers include surgery centers, freestanding emergency rooms, urgent care centers, diagnostic and imaging centers, walk-in clinics, and physician clinics. HCA describes itself as itself as a "one of the nation's leading providers of healthcare services."[1]

2.      On July 5, 2023, DataBreaches.net broke the news that HCA's data was up for sale on

---

[1] *Who We Are*, HCA Healthcare, https://hcahealthcare.com/about/ (last visited July 22, 2023).

a deep web forum if the HCA did not meet certain demands.[2]

3.      On July 10, 2023, HCA disclosed in a privacy update on its website that unauthorized parties had infiltrated its systems (the "Data Breach").[3] These hackers intentionally compromised HCA's systems and absconded with millions of rows of data, including Plaintiff's and Class Members' names, dates of birth, email addresses, phone numbers, and medical appointment information, *i.e.*, Personally Identifiable Information ("PII")[4] and Protected Health Information ("PHI")[5] (together, "Private Information").[6]

4.      HCA posted a privacy update on its website that the confirmed that the Private Information of *nearly 11 million Americans* was quietly exfiltrated and "was made available by an unknown and unauthorized party on an online forum."[7] The magnitude of the Data Breach demonstrates the fatal deficiencies in HCA's data protection measures.

5.      HCA, however, did not inform its patients that their Private Information was compromised until on or about July 14, 2023.[8] The company has offered no assurance that it has

---

[2] *HCA Healthcare patient data for sale on hacking forum?*, DataBreaches.NET (July 5, 2023), https://www.databreaches.net/developing-hca-healthcare- patient-data-for-sale-on-hacking-forum/.

[3] *HCA Healthcare Reports Data Security Incident*, HCA Healthcare (July 10, 2023), https://hcahealthcare.com/about/privacy-update.dot.

[4] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the subject data breach.

[5] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. Dep't of Health and Human Services (Oct. 25, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.

[6] Jill McKeon, *HCA Healthcare Suffers Data Breach, 11M Patients Impacted,* Health IT Security (July 10, 2023), https://healthitsecurity.com/news/hca-healthcare-suffers-data-breach.

[7] *Privacy Update–HCA Healthcare Reports Data Security Incident*, HCA Healthcare (July 10, 2023) https://hcahealthcare.com/about/privacy-update.dot#privacyUpdate.

[8] HCA Healthcare Incident Report, *supra* n.3.

2

adequately enhanced its data security practices in the wake of the breach or that the compromised data was recovered.

6.     HCA has a duty to safeguard and protect members' information entrusted to it and could have prevented this theft by implementing adequate security measures.

7.     Plaintiff and Class Members entrusted HCA with and allowed HCA to collect highly sensitive information relating to their health and other matters as part of seeking medical treatment. They did so confidently, with the legitimate expectation that HCA would respect their privacy and act appropriately.

8.     Plaintiff brings this class action because Defendant collected but failed to secure and safeguard the valuable Private Information of patients.

9.     As a result, 11 million patients had their Private Information compromised in the Data Breach. Due to Defendant's failure to protect the consumer information it was entrusted to safeguard, Plaintiff and Class Members suffered a loss of the value of their Private Information, and have been exposed to or are at imminent and significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future.

10.     Defendant's intentional, willful, reckless, unfair, and negligent conduct—failing to prevent the breach, failing to limit its severity, and failing to detect it in a timely fashion—harmed Plaintiff and Class Members uniformly. For this reason, Defendant should pay for monetary damages and appropriate identity theft protection services, as well as reimburse Plaintiff for the costs caused by Defendant's substandard security practices and failure to timely disclose the same. Plaintiff is likewise entitled to injunctive and other equitable relief that safeguards their information, requires Defendant to improve its data security significantly, and provides independent, expert oversight of Defendant's security systems.

11.     Defendant has also been unfairly and unjustly enriched because of its improper

3

conduct, such that it would be inequitable for it to retain the benefits conferred upon it by Plaintiff and the Class Members. Plaintiff, Class Members, and public agencies never would have entrusted Defendant with its members' Personal Information had they known that Defendant would permit unauthorized access to its Personal Information because of Defendant's complete and utter disregard for security safeguards and protocols. Plaintiff would have used other providers.

12. Defendant's investigation concluded that the Private Information compromised in the Data Breach included Plaintiff's and approximately 11 million other patients' information, which included over 27 million rows of data.

13. Defendant's failure to safeguard Plaintiff and the Class Members' highly sensitive Private Information as exposed and unauthorizedly disclosed in the Data Breach violates its common law duty and Defendant's implied contract with its patients to safeguard their Private Information.

14. Plaintiff and Class Members now face a lifetime risk of identity theft due to the nature of the information lost, and a diminishment in the value of their private data.

15. Defendant's conduct has injured Plaintiff and Class Members in the following ways: (a) the lost or diminished value of their Private Information; (b) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (c) lost opportunity costs to mitigate the Data Breach's consequences; and (d) emotional distress associated with the loss of control over their highly sensitive Private Information.

16. Defendant's failure to protect patients' Private Information has harmed and will continue to harm millions of patients, causing Plaintiff to seek this herein relief.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative Class Members, and minimal

diversity exists because many putative Class Members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

18.     This Court has personal jurisdiction over HCA because it is headquartered in Nashville, Tennessee and maintains its principal place of business in this District.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Defendant's principal place of business is within this District and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District.

## PARTIES

20.     Defendant HCA Healthcare, Inc. is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

21.     Plaintiff Arthur Dekenipp is a resident and citizen of Alvin, Texas.

22.     Plaintiff received medical services at an HCA facility in October 2021.

23.     Plaintiff has no direct relationship with HCA other than in connection with his receipt of health care services.

24.     In order to receive health care services, Plaintiff was required to and did provide his private health information and personal information to HCA.

25.     Plaintiff received an email from HCA on July 20, 2023, at 3:59 AM CDT, informing him about the Data Breach.

26.     Other than the Data Breach, Plaintiff is not aware of any other means by which unauthorized persons could have come into possession of his private health information or personal information. He regularly takes steps to safeguard his private information while in his control.

27.     Defendant HCA Healthcare, Inc. is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

## A. The Data Breach

28.     In or about July 2023, Defendant discovered that Private Information with respect to millions of its patients was made available by an unknown and unauthorized party on an online forum.[9]

29.      Defendant learned about the Data Breach because the data hacker posted a sample of the stolen data on an online forum. HCA did not learn about the Data Breach through its own data security system.

30.     Defendant claims to have discovered the Data Breach on July 5, 2023.[10]

31.     Defendant states that its investigation is ongoing but it believes "that the list contains approximately 27 million rows of data that may include information for approximately 11 million HCA Healthcare patients."[11] The compromised patient information includes: patient name, city, state, zip code, email, telephone number, date of birth, gender, patient service date, location and next appointment date.[12] The stolen data also appears to include patient visit or "encounter" information with medical providers and the name of the healthcare facility.[13]

32.     Defendant has stated that the data was stolen from "an external storage location exclusively used to automate the formatting of email messages."[14]

33.     Defendant claims to have taken immediate steps to secure its systems and begin an investigation, including disabling user access to the external storage location.[15] As noted above, however, whatever efforts it took were far too little, far too late—the hackers had already absconded

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Developing: HCA Healthcare patient data for sale on hacking forum?*, DATABREACHES.NET (July 5, 2023) https://www.databreaches.net/developing-hca-healthcare- patient-data-for-sale-on-hacking-forum.
[14] HCA Healthcare Incident Report, *supra* n.3.
[15] *Id.*

with everything they wanted.

34. Further, Defendant claims to have "several robust security strategies, systems, and protocols in place to help protect data."[16] This empty assurance does not allow Plaintiff to form even a general notion of the nature or extent of HCA's remedial measures, but in light of the magnitude of the Data Breach, the vulnerabilities to be remedied must have been pervasive and fundamental.

**B. Defendant Failed to Comply with Regulatory Requirements and Industry Practices**

35. The Federal Trade Commission ("FTC") has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

36. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[18] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of PII/PHI that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

37. The FTC also recommends that companies not maintain PII/PHI longer than is

---

[16] *Id.*

[17] *Start With Security*, Federal Trade Commission, at 2, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 2, 2020).

[18] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission, https://www.ftc.ov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 2, 2020).

needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[19]

38.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

39.     The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data. The body of law created by the FTC recognizes that failure to restrict access to information[20] and failure to segregate access to information[21] may violate the FTC Act.

40.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data (i.e., PII/PHI) constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

41.     Further, Defendant is required to comply with the HIPAA Privacy Rules, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. The Privacy Rule and the

---

[19] *See* FTC, *Start With Security, supra* n.17.
[20] *In re Labmd, Inc,* No. 9357, 2016 WL 4128215, at 15 (F.T.C. July 28, 2016) ("Procedures should be in place that restrict users' access to only that information for which they have a legitimate need.").
[21] *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 258 (3d Cir. 2015) (companies should use "readily available security measures to limit access between" data storage systems).

Security Rule set the nationwide standards for protecting health information, including health information stored electronically.

42. The Security Rule requires Defendant to do the following:

   a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d. Ensure compliance by its workforce.[22]

43. Pursuant to HIPAA's mandate that Defendant follow "applicable standards, implementation specifications, and requirements . . . with respect to electronic protected health information," 45 C.F.R. § 164.302, Defendant were required to, at minimum, to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

44. Defendant is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

45. Both HIPAA and HITECH obligate Defendant to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of

---

[22] *Summary of the HIPAA Security Rule*, U.S. Dep't of Health and Human Services (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html.

sensitive patient PII. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. §17902. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

46.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of patients; Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly egregious given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class Members.

47.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

48.     The hackers accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiff and Class Members, including their name, date of birth, and patients' appointment information. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

49.     As a condition to obtain medical care from Defendant-owned or operated providers, Plaintiff and Class Members were required to give their sensitive and confidential Private Information to Defendant.

50.     Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, Defendant would be unable to provide its services.

51. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

52. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

53. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

54. Upon information and belief, Defendant (through its providers) made promises to Plaintiff and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

55. Defendant's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**C.** **Defendant's Knowledge of Cyber Security Threats**

56. Defendant knew or should have known of the risk of a cyber attack, because healthcare entities in possession of private information are particularly suspectable to cyber attacks.

57. Data thieves regularly target entities in the healthcare industry like Defendant due to the highly sensitive information that they maintain. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

58. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities—like Defendant—that

collect and store Private Information and other sensitive information, preceding the date of the Data Breach. Between 2020 and 2021, attacks on the healthcare industry increased 71%, making it the fifth most common industry targeted by cyberattacks.[23]

59.   In light of recent high profile data breaches at other industry-leading companies, including, e.g., Trinity Health (3.3 million patients, May 2020); Shields Healthcare Group (2 million patients, March 2022); Community Health Systems (1.2 million patients, January 2023); PharMedica (4.8 million patients, March 2023); Regal Medical Group (3.3 million patients, December 2022); Harvard Pilgrim Healthcare (2.5 million patients, April 2023), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.[24]

60.   The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[25]

61.   Entities in custody of PHI reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach. In fact, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[26] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums

---

[23] Check Point Research Team, *Check Point Research: Cyber Attacks Increased 50% Year over Year*, Check Point (Jan. 10, 2022), https://blog.checkpoint.com/security/check-point-research-cyber-attacks-increased-50-year-over-year.

[24] For example, of the 1,862 recorded data breaches in 2021, 330 of them, or 17.7%, were in the medical or healthcare industry. *See 2021 Data Breach Annual Report*, ITRC, at 6 (Jan. 2022), https://notified.idtheftcenter.org.

[25] *Id.*

[26] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[27]

62.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

63.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its server(s), amounting to *millions* of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

64.     In its Data Security Incident Report, Defendant states that it "disabled user access to storage location as an immediate containment measure" and that it has "several robust security strategies, systems, and protocols in place to help protect data."[28] Defendant also stated that they "will offer credit monitoring where appropriate," with no detail about what that monitoring will include, to whom it will be offered, or when it will be operational and available to victims of this breach.

65.     This is wholly inadequate to compensate Plaintiff and Class Members, as it fails to account for the multiple years of ongoing identity theft and financial fraud commonly faced by victims of data breaches and other unauthorized disclosures. It also fails to provide sufficient compensation to Plaintiff and Class Members for the unauthorized release and disclosure of their Private Information. Moreover, once the identity theft service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

---

[27] *Id.*
[28] *Supra*, n.3.

66. Defendant's offering of identity theft protection establishes that Plaintiff's and Class Members' sensitive Private Information *was* in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems. Moreover, Defendant's offer indicates that it recognizes that Plaintiff and Class Members are at a present and continuing risk of identity theft and fraud as a result of the Data Breach.

67. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

68. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

69. As a healthcare entity in possession of its Patients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members because of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

**D. Defendant's Duty to Safeguard Plaintiff and Class Members' Private Information**

70. Defendant owed Plaintiff and Class Members a duty to safeguard their private information.

71. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class

Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

72.     Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

73.     Defendant owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

74.     Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

75.     Defendant owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

76.     Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**E.     The Effect of the Data Breach on Impacted Customers**

77.     The exponential cost to Plaintiff Dekenipp and Class Members resulting from the Data Breach cannot be overstated. Criminals can use victims' Private Information to open new financial accounts, incur charges in credit, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII and PHI was stolen

becomes aware of it.[29] Any one of these instances of identity theft can have devastating consequences for the victim—causing years of often irreversible damage to their credit scores, financial stability, and personal security.

78.     According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, fraudsters commonly use stolen medical and protected health data "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[30]

79.     Defendant was or should have been aware that it was collecting highly valuable data, which has increasingly been the target of data breaches in recent years, i.e., unencrypted Private Information may fall into the hands of identity thieves.

80.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

81.     Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in

---

[29] *See, e.g.*, *Report to Congressional Requesters*, United States Government Accountability Office (June 2007), http://www.gao.gov/assets/270/262899.pdf; Melanie Lockert, *How do hackers use your information for identity theft?*, CreditKarma (Oct. 1, 2021), https://www.creditkarma.com/id-theft/i/how-hackers-use-your-information; Ravi Sen, *Here's how much your personal information is worth to cybercriminals – and what they do with it*, PBS (May 14, 2020), https://www.pbs.org/newshour/science/heres-how-muchyour-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it; Alison Grace Johansen, *4 Lasting Effects of Identity Theft*, LifeLock by Norton (Feb. 4, 2021), https://lifelock.norton.com/learn/identity-theft-resources/lasting-effects-ofidentity-theft.
[30] Jim Finkle, *Your medical record is worth more to hackers your credit card*, Reuters (Sept. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

16

a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit from their misfortune.

### Diminution of Value of Private Information.

82.     Private Information is valuable property.[31] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

83.     The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements.

84.     This type of data commands a much higher price on the dark web. As Martin Walter, senior director at cybersecurity firm RedSeal, explained: "Compared to credit card information, personally identifiable information … [is] worth more than 10x on the black market."[32]

85.     An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[33] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker

---

[31] *See Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*" at 2, U.S. Government Accountability Office (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem- hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed July 11, 2023).

who in turn aggregates the information and provides it to marketers or app developers.[34] Consumers who agree to allow the startup Caden to track their online habits can receive up to $50 a month.[35]

86.     As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

87.     The fraudulent activity resulting from the Data Breach and harming Class Members may not come to light for years.

88.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

89.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to millions of individuals' detailed Private Information and thus the significant number of individuals who would be harmed by the exposure of the unencrypted data.

90.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

---

[34] David Lazarus, Column: *Shadowy data brokers make the most of their invisibility cloak*, Los Angeles Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[35] Wilfred Chan, *This startup hopes to pay users $50 a month to sell companies their data*, Fast Company (Mar. 21, 2023), https://www.fastcompany.com/90865694/caden-hopes-to-pay-users-50-dollars-a-month-to-sell-companies-their-data.

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

91.     As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

92.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the severity of the Data Breach upon receiving their Notice Letters.

93.     Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[36]

94.     Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

---

[36] *See* GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. Government Accountability Office (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[37] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last accessed July 23, 2023).

95.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

96.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

97.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### *Impact Of Identity Theft Can Have Ripple Effects*

98.     Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, in addition to the irreparable damage that may result from the theft of a social security number, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[38]

99.     And, the impact of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they experienced affected their ability to get credit cards and obtain loans such as student loans or

---

[38] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

mortgages.[39] For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high interest payday loan versus a lower-interest loan.

100.    It is no wonder then that identity theft exacts a severe emotional toll on its victims.

101.    The 2017 Identity Theft Resource Center survey[40] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed

- 67% reported anxiety

- 66% reported feelings of fear related to personal financial safety

- 37% reported fearing for the financial safety of family members

- 24% reported fear for their physical safety

- 15.2% reported a relationship ended or was severely and negatively impacted by the identity theft

- 7% reported feeling suicidal.

102.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances

- 37.1% reported an inability to concentrate / lack of focus

- 28.7% reported they were unable to go to work because of physical symptoms

---

[39] *Identity Theft: The Aftermath 2017*, Identity Theft Resource Center, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited July 27, 2023).
[40] *Id.*

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues)

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[41]

103.    There may also be a significant time lag between when PII/PHI is stolen and when it is actually misused. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> **[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[42]**

104.    As the result of the Data Breach, Plaintiff and Class Members have suffered and/or will suffer or continue to suffer economic loss, a substantial risk of future identity theft, and other actual harm for which they are entitled to damages, including, but not limited to, the following:

- losing the inherent value of their Private Information;

- losing the value of Defendant's implicit promises of adequate data security;

- identity theft and fraud resulting from the theft of their Private Information;

- costs associated with the detection and prevention of identity theft and unauthorized use of their medical and health insurance information;

- costs associated with purchasing credit monitoring and identity theft protection services;

- unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

---

[41] *Id.*
[42] *See,* GAO, *Report to Congressional Requesters, supra,* n.29.

- lowered credit scores resulting from credit inquiries following fraudulent activities;
- costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the repercussions of the Data Breach; and
- the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Private Information being in the possession of one or many unauthorized third parties.

105.    Additionally, Plaintiff and Class Members place significant value in data security.

106.    Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like Defendant would have no reason to tout their data security efforts to their actual and potential customers.

107.    Consequently, had consumers known the truth about Defendant's data security practices—that Defendant would not adequately protect and store their data—they would not have entrusted their Private Information to Defendant, purchased health benefits that included Defendant's services, or paid as much for such services or benefits. As such, Plaintiff and Class Members did not receive the benefit of their bargain with Defendant because they paid for a value of services they expected but did not receive

## CLASS ACTION ALLEGATIONS

108.    Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiff brings this action on behalf of himself and on behalf of all members of the proposed Nationwide Class (the "Class") defined as:

>       **All individuals residing in the United States whose Private Information was accessed and/or acquired by an**

23

> **unauthorized party as a result of the HCA Data Breach reported to have occurred on or about July 5, 2023.**

109.    The Nationwide Class asserts claims against Defendant for Negligence (Count 1), Negligence per se (Count 2), Gross Negligence (Count 3), and Breach of Implied Contract (Count 4).

110.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of a Texas subclass (the "Texas Subclass") for statutory claims under Texas consumer protection statutes (Count 5), defined as follows:

> **All persons in Texas whose Private Information was compromised in the Data Breach reported to have occurred on or about July 5, 2023.**

111.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

112.    Plaintiff reserves the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

113.    **Numerosity**: The members of the Class and the Texas Subclass are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Defendant has represented on its website that 11 million patients are affected by the Data Breach. Those individuals' names and addresses are available from Defendant's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods. Joinder of all Class Members is impracticable.

24

114.    **Commonality**: This action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.    Whether Defendant had a duty to protect the Plaintiff's and the Class Members' Private Information;

b.    Whether Defendant owed a legal duty to Plaintiff's and the Class to exercise due care in collecting and storing their Private Information;

c.    Whether Defendant failed to take reasonable and prudent security measures;

d.    Whether Defendant was negligent in failing to implement reasonable and adequate security procedures and practices;

e.    Whether Defendant's security measures to protect its systems were reasonable in light known legal requirements;

f.    Whether Defendant's efforts (or lack thereof) to ensure the security of its members' Private Information were reasonable in light of known legal requirements;

g.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

h.    Whether Defendant's conduct constituted unfair or deceptive trade practices;

i.    Whether Defendant's failure to institute adequate security measures amounted to breach of an implied contract;

j.    Whether Defendant violated state law when it failed to implement reasonable security procedures and practices;

k.    Which security procedures and notification procedures Defendant should be required to implement;

l.    Whether Defendant violated state consumer protection and data breach statutes in connection with the actions described herein;

m.    Whether Defendant failed to notify Plaintiff and Class Members as soon as practicable and without delay after the Data Breach was discovered;

n.    Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach and/or the loss of the Private Information of Plaintiff and Class Members;

o.    Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect their Private

Information; and

p.    Whether Plaintiff and Class Members are entitled to damages or injunctive relief.

115.    **Typicality:** Plaintiff's claims are typical of those of the other Class Members because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

116.    This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

117.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

118.    **Superiority**: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that millions of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain

Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

119. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

120. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

121. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

## COUNT 1

## NEGLIGENCE

### On Behalf of Plaintiff, the Nationwide Class, and the Texas Subclass

122. Plaintiff repeats and alleges Paragraphs 1-127, as if fully alleged herein.

123. Defendant acquired, maintained, and profited from Plaintiff's and Class Members' sensitive Private Information. Defendant owed a duty to Plaintiff and Class Members, arising from the sensitivity of the information, the expectation the information was going to be kept private, and the foreseeability of its data safety shortcomings resulting in an intrusion, to exercise reasonable care in safeguarding their sensitive personal information. This duty included, among other things, designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiff's and Class Members' information was adequately secured from unauthorized access.

124. Defendant had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class Members would be harmed by the failure to protect their Private Information because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendant also knew that it was more likely than not Plaintiff and other Class Members would be harmed by such theft.

125. Defendant is covered by HIPAA (45 C.F.R. § 160.102) and thus required to comply with the HIPAA Privacy Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

126. Defendant owed a duty to Plaintiff and Class Members to implement administrative, physical, and technical safeguards, such as intrusion detection processes that detect data breaches in a timely manner, to protect and secure Plaintiff's and Class Members' Private Information.

127.    Defendant also had a duty to monitor, supervise, control, or otherwise provide oversight to safeguard the Private Information that was collected and stored on their servers.

128.    Defendant owed a duty to disclose the material fact that its data security practices were inadequate to safeguard Plaintiff's and Class Members' Private Information.

129.    Defendant also had independent duties under Plaintiff's and Class Members' state laws that required Defendant to reasonably safeguard Plaintiff's and Class Members' PII and PHI, and promptly notify them about the Data Breach.

130.    Defendant had a special relationship with Plaintiff and Class Members as a result of being entrusted with their Private Information, which provided an independent duty of care. Plaintiff's and Class Members' willingness to entrust Defendant with their Private Information was predicated on the understanding that Defendant would take adequate security precautions. Moreover, Defendant was capable of protecting its networks and systems, and the PII and PHI it stored on them, from unauthorized access.

131.    Defendant breached their duties by, among other things: (a) failing to implement and maintain appropriate data security practices to safeguard Plaintiff's and Class Members' Private Information, including administrative, physical, and technical safeguards; (b) failing to detect the Data Breach in a timely manner; and (c) failing to disclose that its data security practices were inadequate to safeguard Plaintiff's and Class Members' Private Information.

132.    But for Defendant's breach of their duties, including the duty to use reasonable care to protect and secure Plaintiff's and Class Members' Private Information, Plaintiff's and Class Members' Private Information would not have been accessed by unauthorized parties.

133.    Plaintiff and Class Members were foreseeable victims of Defendant's inadequate data security practices. Defendant knew or should have known that a breach of their data security systems would cause damage to Plaintiff and Class Members.

134. It was reasonably foreseeable that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information would result in unauthorized access to Defendant's networks, databases, and computers that stored or contained Plaintiff's and Class Members' Private Information.

135. As a result of Defendant's negligent failure to prevent the Data Breach, Plaintiff and Class Members suffered injury, which includes, but is not limited to, exposure to a heightened and imminent risk of fraud, identity theft, and financial harm. Plaintiff and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members have also incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter and detect identity theft. The unauthorized acquisition of Plaintiff's and Class Members' Private Information has also diminished the value of the Private Information.

136. The harm to Plaintiff and Class Members was a proximate, reasonably foreseeable result of Defendant's breaches of their aforementioned duties.

137. Therefore, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

## COUNT 2

## NEGLIGENCE *PER SE*

On Behalf of Plaintiff, the Nationwide Class, and the Texas Subclass

138. Plaintiff repeats and alleges Paragraphs 1-127, as if fully alleged herein.

139. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and appropriate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

140. In addition, under state data security statutes, Defendant had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class Members' Private Information.

141. Defendant breached their duties to Plaintiff and Class Members, under the FTC Act and the state data security statutes, by failing to provide fair, reasonable, or appropriate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

142. Defendant is covered by HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule, 45 C.F.R Part 160 and Par108501t 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. HIPAA prohibits unauthorized disclosures of "protected health information," which includes the information at issue here.

143. Plaintiff and Class Members were foreseeable victims of Defendant's violations of the FTC Act, HIPAA, and state data security statutes. Defendant knew or should have known that the failure to implement reasonable measures to protect and secure Plaintiff's and Class Members' Private Information would cause damage to Plaintiff and Class Members.

144. Defendant's failure to comply with the applicable laws and regulations constitutes negligence per se.

145. But for Defendant's violation of the applicable laws and regulations, Plaintiff's and Class Members' Private Information would not have been accessed by unauthorized parties.

146. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

# COUNT 3

## GROSS NEGLIGENCE

<u>On Behalf of Plaintiff, the Nationwide Class, and the Texas Subclass</u>

147.     Plaintiff repeats and alleges Paragraphs 1-127, as if fully alleged herein.

148.     Plaintiff and Class Members entrusted Defendant with highly sensitive and inherently personal Private Information subject to confidentiality laws.

149.     In requiring, obtaining and storing Plaintiff's and Class Members' Private Information, Defendant owed a duty of reasonable care in safeguarding the PII and PHI.

150.     Defendant's networks, systems, protocols, policies, procedures, and practices, as described above, were not adequately designed, implemented, maintained, monitored, and tested to ensure that Plaintiff's and Class Members' Private Information were secured from unauthorized access.

151.     Defendant's networks, systems, protocols, policies, procedures, and practices, as described above, were not reasonable given the sensitivity of the Plaintiff's and Class Members' private data and the known vulnerabilities of Defendant's systems. Defendant did not comply with state and federal laws and rules concerning the use and safekeeping of this private data.

152.     Upon learning of the Data Breach, Defendant should have immediately disclosed the Data Breach to Plaintiff and Class Members, credit reporting agencies, the Internal Revenue Service, financial institutions, and all other third parties with a right to know and the ability to mitigate harm to Plaintiff and Class Members as a result of the Data Breach.

153.     Despite knowing its networks, systems, protocols, policies, procedures, and practices, as described above, were not adequately designed, implemented, maintained, monitored, and tested to ensure that Plaintiff's and Class Members' Private Information were secured from unauthorized

access, Defendant ignored the inadequacies and was oblivious to the risk of unauthorized access it had created.

154. Defendant's behavior establishes facts evidencing a reckless disregard for Plaintiff's and Class Members' rights.

155. Defendant, therefore, was grossly negligent.

156. Defendant's negligence also constitutes negligence per se.

157. The negligence is directly linked to injuries.

158. As a result of Defendant's reckless disregard for Plaintiff's and Class Members' rights by failing to secure their PII and PHI, despite knowing its networks, systems, protocols, policies, procedures, and practices were not adequately designed, implemented, maintained, monitored, and tested, Plaintiff and Class Members suffered injury, which includes but is not limited to the exposure to a heightened, imminent risk of fraud, identity theft, financial and other harm. Plaintiff and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members also have incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The unauthorized acquisition of Plaintiff's and Class Members' Private Information has also diminished the value of the Private Information.

159. The harm to Plaintiff and the Class Members was a proximate, reasonably foreseeable result of Defendant's breaches of the applicable laws and regulations.

160. Therefore, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

## COUNT 4

## BREACH OF IMPLIED CONTRACT

On Behalf of Plaintiff, the Nationwide Class, and the Texas Subclass

161. Plaintiff repeats and alleges Paragraphs 1-127, as if fully alleged herein.

162. Defendant—through its providers—offered to provide services to Plaintiff and Class Members in exchange for payment.

163. Defendant also required Plaintiff and the Class Members to provide Defendant with their Private Information to receive medical care.

164. Accordingly, Defendant impliedly promised to protect Plaintiff's and Class Members' Private Information through adequate data security measures.

165. Plaintiff and the Class Members accepted Defendant's offer by providing Private Information to Defendant in exchange for receiving Defendant's services, and then by paying for and receiving the same.

166. Plaintiff and Class Members would not have entrusted their Private Information to Defendant but for the above-described agreement with Defendant.

167. Defendant materially breached its agreements with Plaintiff and Class Members by failing to safeguard such Private Information, violating industry standards necessarily incorporated in the agreement.

168. Plaintiff and Class Members have performed under the relevant agreements.

169. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms.

34

170. Defendant's conduct as alleged herein violated this implied covenant of good faith and fair dealing inherent in every contract.

171. The losses and damages Plaintiff and Class Members sustained as described herein were the direct and proximate result of Defendant's breach of the implied contracts with them, including breach of the implied covenant of good faith and fair dealing.

## COUNT 5

## DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT

*Texas Bus. & Com. Code §§ 17.41, et seq*

On Behalf of Plaintiff and the Texas Subclass

172. Plaintiff, individually and on behalf of the Texas Subclass, repeats and alleges Paragraphs 1-127, as if fully alleged herein.

173. Defendant is a "person" as defined by Tex. Bus. & Com. Code § 17.45(3).

174. Plaintiff and the Texas Subclass are "consumer[s]" as defined by Tex. Bus. & Com. Code § 17.45(4).

175. Defendant advertised, offered, or sold services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

176. Defendant engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendant engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

177. Consumers, including Plaintiff and Texas Subclass, lacked knowledge about deficiencies in Defendant's data security because this information was known exclusively by Defendant. Consumers also lacked the ability, experience, or capacity to secure their Private

Information in Defendant's possession or to fully protect their interests with regard to their data. Plaintiff and Texas Subclass Members lack expertise in information security matters and do not have access to Defendant's systems in order to evaluate their security controls. Defendant took advantage of their special skill and access to the Private Information to hide their inability to protect the security and confidentiality of Plaintiff's and Texas Subclass Members' Private Information.

178.     Defendant intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Defendant's conduct is glaringly noticeable, flagrant, complete, and unmitigated. The Data Breach, which resulted from the Defendant's unconscionable business acts and practices, exposed Plaintiff and Texas Subclass Members to a wholly unwarranted risk to the safety of their Private Information and the security of their identity or credit, and imposed a substantial hardship on a significant and unprecedented number of consumers. Plaintiff and Texas Subclass Members cannot mitigate this unfairness because they cannot undo the Data Breach.

179.     Defendant acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiff's and the Texas Subclass' rights. Defendant is of such a sophisticated and large nature that other data breaches and public information regarding security vulnerabilities put them on notice that their security and privacy protections were inadequate.

180.     As a direct and proximate result of the Defendant's unconscionable and deceptive acts or practices, Plaintiff and the Texas Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with and overcharges by Defendant, as they would not have paid for services or would have paid less for such services but for the violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses

related to monitoring their financial accounts for fraudulent activity; loss of value of their Private Information; and an increased, imminent risk of fraud and identity theft.

181.     Defendant's unconscionable and deceptive acts or practices were a producing cause of Plaintiff's and Texas Subclass' injuries, ascertainable losses and economic and non-economic damages.

182.     Defendant's violations present a continuing risk to Plaintiff and Texas Subclass Members as well as to the general public.

183.     Plaintiff and the Texas Subclass seek all monetary and non-monetary relief allowed by law, including economic damages; treble damages for each act committed intentionally or knowingly; restitution; court costs; reasonable and necessary attorneys' fees; injunctive relief; and any other relief which the Court deems proper.

## REQUEST FOR RELIEF

184.     WHEREFORE Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.     permanent declaratory and injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

b.     compensatory, consequential, and general damages in an amount to be determined at trial;

c.     disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts, omissions, and practices, in amounts to be determined at trial;

d.     statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

e.     costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f.     pre- and post-judgment interest at the maximum legal rate; and

37

g.    all such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: July 31, 2023

Respectfully submitted,

*/s/ Mark P. Chalos*
Mark P. Chalos
Kenneth S. Byrd
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
222 2nd Ave S #1640
Nashville, TN 37201
Tel: 615-313-9000
mchalos@lchb.com
kbyrd@lchb.com

Jason L. Lichtman (*pro hac vice* forthcoming)
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Fl.
New York, NY 10013-1413
Tel: (212) 355-9500
jlichtman@lchb.com

Michael W. Sobol (*pro hac vice* forthcoming)
Jallé H. Dafa (*pro hac vice* forthcoming)
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: 415-956-1000
msobol@lchb.com
jdafa@lchb.com

Sabita J. Soneji (*pro hac vice*

forthcoming)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA  94612
Tel: (510) 254-6808
ssoneji@tzlegal.com

*Counsel for Plaintiff and the Proposed Class*